United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 26, 2003**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 02-10321

_____

REAVES BROKERAGE COMPANY, INC.,

Plaintiff-Appellee,

versus

SUNBELT FRUIT & VEGETABLE COMPANY, INC. ET AL.,

Defendants,

FIDELITY FACTORS LLC,                       Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

Before JONES, WIENER, and DeMOSS, Circuit Judges.

WIENER, Circuit Judge:

Defendant-Appellant Fidelity Factors, L.L.C. ("Fidelity")

appeals the district court's grant of summary judgment in favor of

Plaintiff-Appellee Reaves Brokerage, Inc. ("Reaves") on its claims

for reimbursement under the Perishable Agricultural Commodities

Act, 7 U.S.C. §§ 499a-499s ("PACA"). For the following reasons, we

AFFIRM.

# I. FACTS AND PROCEEDINGS

Reaves sells and brokers fresh fruits and vegetables. On several occasions, Reaves made interstate commerce sales of produce to a wholesaler, Sunbelt Fruit & Vegetable Company ("Sunbelt"). In March 2000, Sunbelt ceased operations, owing Reaves $195,060.55 in unpaid invoices for produce delivered in June, July, and December of 1999. Reaves immediately filed suit against Sunbelt seeking damages under PACA. In July 2000, Reaves filed an amended complaint, adding as defendants (1) Fidelity Factors, L.L.C., a "factor" that contends it had purchased particular accounts receivable from Sunbelt, (2) James Heffington, Sr., Sunbelt's president and sole shareholder, and (3) Lone Star Produce Company, Sunbelt's alleged successor.

In October 2000, the district court granted a default judgment against Sunbelt in the amount of $195,060.55. Reaves eventually filed motions to dismiss its claims against Lone Star and for summary judgment, on its PACA trust claims against Fidelity and Heffington. Fidelity responded and filed a cross-motion for summary judgment. The district court referred these summary judgment motions to a magistrate judge who recommended granting Reaves's motion and denying Fidelity's cross motion. After de novo review and consideration of Fidelity's objections, the district court adopted the recommendation of the magistrate judge and entered judgment in favor of Reaves against Fidelity and

2

Heffington, jointly and severally, in the amount of the default judgment previously rendered against Sunbelt, $195,060.55. Fidelity timely filed a notice of appeal but Heffington did not appeal.

## II. ANALYSIS

### A. Standard of Review

We review a grant of summary judgment <u>de novo</u>, applying the same standard as the district court.[1] A motion for summary judgment is properly granted only if there is no genuine issue as to any material fact.[2] An issue is material if its resolution could affect the outcome of the action.[3] In deciding whether a fact issue has been created, we view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party.[4]

The standard for summary judgment mirrors that for judgment as a matter of law.[5] Thus, the court must review all of the evidence in the record, but make no credibility determinations or weigh any

---

[1] <u>Morris v. Covan World Wide Moving, Inc.</u>, 144 F.3d 377, 380 (5th Cir. 1998).

[2] Fed.R.Civ.P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

[3] <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

[4] <u>See</u> <u>Olabisiomotosho v. City of Houston</u>, 185 F.3d 521, 525 (5th Cir. 1999).

[5] <u>Celotex Corp.</u>, 477 U.S. at 323.

evidence.[6]  In reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as evidence supporting the moving party that is uncontradicted and unimpeached.[7]  The nonmoving party, however, cannot satisfy his summary judgment burden with conclusional allegations, unsubstantiated assertions, or only a scintilla of evidence.[8]

**B. PACA**

PACA was enacted in 1930 to regulate the sale of perishable commodities[9] and "promote fair dealing" in the sale of fruits and vegetables.[10] In 1984, PACA was amended to extend its protection to sellers of perishable commodities, who, because of the need to sell their products quickly, were often unsecured creditors of buyers whose creditworthiness they were unable to evaluate before the sale.[11]  To "remedy this burden on commerce in perishable

---

[6] Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000).

[7] Id. at 151.

[8] Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

[9] Endico Potatoes, Inc. v. CIT Group/Factoring, Inc., 67 F.3d 1063, 1066 (2d Cir. 1995).

[10] Golman-Hayden Co. v. Fresh Source Produce, Inc., 217 F.3d 348, 350 (5th Cir. 2000).

[11] Endico Potatoes, 67 F.3d at 1067.

4

commodities,"[12] Congress added the provisions in § 499(e), which create, immediately upon delivery, a nonsegregated "floating" trust in favor of sellers on the perishable commodities sold and the products and proceeds derived from the commodities.[13] If the seller is not paid promptly, the trust assets must be preserved and the seller's claims prime those of other secured and unsecured creditors for the full amount of the claim.[14]

General principles of trust law govern PACA trusts.[15] Accordingly, a "bona fide purchaser" of trust assets receives the assets free of claims by trust beneficiaries.[16] Consequently, unpaid sellers are not able to recover trust proceeds conveyed to a third party if that party received the proceeds "for value" and "without

---

[12] 7 U.S.C. § 499e(c)(explaining that "[t]his subsection is intended to remedy such burden on commerce in perishable agricultural commodities and to protect the public interest").

[13] Endico Potatoes, 67 F.3d at 1067; see 7 U.S.C. § 499e(c)(2)("Perishable agricultural commodities received by a commission merchant, dealer, or broker . . . shall be held . . . in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing . . . have been received . . . .").

[14] See Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997)("The PACA grants the sellers of such commodities the right to recover against the purchasers and puts the sellers in a position superior to all other creditors.").

[15] Id.

[16] Endico Potatoes, 67 F.3d at 1067.

notice of the breach of trust."[17] A transfer is "for value" "if money is paid or other property is transferred or services are rendered as consideration for the transfer of trust property."[18] Lenders who receive trust assets through enforcement of a security agreement are <u>not</u> bona fide purchasers, however, because such transfers are not "for value."[19]

The determinative issue presented in this appeal is whether, as a matter of law, the "factoring agreement" between Sunbelt and Fidelity was (1) a loan secured by Sunbelt's accounts receivable or (2) a true sale or "factoring" of the accounts receivable to Fidelity. Reaves argues, and the district court concluded, that in spite of its label and the terminology used, the agreement executed between Fidelity and Sunbelt was not truly a sale of accounts receivable, but was in substance a secured lending agreement, under which Fidelity held <u>all</u> of Sunbelt's accounts (and other assets) as collateral and Sunbelt remained personally liable for any shortfall. Fidelity insists that it <u>purchased</u> Sunbelt's accounts and "never made a loan of any type to Sunbelt."

Characterization of the agreement at issue turns on "the substance of the relationship" between Fidelity and Sunbelt, "not

---

[17] <u>Id.</u> at 1068 (quoting Restatement (Second) of Trusts § 284).

[18] <u>Id.</u> (quoting Restatement (Second) of Trusts § 298).

[19] <u>Gargiulo</u>, 131 F.3d at 999-1000.

simply the label attached to the transaction."[20] As this issue under PACA is one of first impression in this circuit, we, like the district court, look for guidance to the Second Circuit's analysis in Endico Potatoes v. CIT Group/Factoring Inc.[21] In Endico Potatoes, the court identified several elements to consider in determining the true legal substance of a transaction involving PACA trust assets, including (1) the right of the creditor to recover from the debtor any deficiency if the assets assigned prove insufficient to satisfy the debt; (2) the effect on the creditor's right to ownership of the assets assigned if the debtor were to pay the debt from independent funds; (3) whether the debtor has a right to amounts recovered from the sale of assets in excess of that necessary to satisfy the debt; and (4) whether the assignment itself reduces the debt.[22] All these features bear on a common question — which party bears the risk? As the Second Circuit explained

> [w]here the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor. If the lender holds only a security interest, however, the lender's

---

[20] Id.; see also Overton Distributors, Inc. v. Heritage Bank, 179 F. Supp. 2d 818, 828 (M.D. Tenn. 2002) (noting that "[whether the [agreement] constituted a breach of trust" "can only be determined by the actual nature of the agreement, regardless of the terminology used").

[21] 67 F.3d 1063 (2d Cir. 1995).

[22] Id. at 1068.

7

risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to satisfy the loan.[23]

Application of the Second Circuit's risk-transfer analysis and our own independent examination of the substance of the parties' agreement leads us to conclude that the relationship between Fidelity and Sunbelt was that of a secured lender and debtor, not a seller and buyer. At the outset, we recognize that several terms and provisions used in the agreement are characteristic of a sale of accounts. For example, (1) the agreement is titled "factoring agreement" and states that "[w]e [Sunbelt] agree to sell to you [Fidelity] as absolute owner" all accounts; (2) account debtors are required to be notified of the sale and instructed to pay Fidelity directly; (3) the parties agreed to a "purchase price"; and (4) Sunbelt had no right to vary the terms of any receivable purchased by Fidelity without Fidelity's prior written consent. If viewed in isolation, these terms would support a conclusion that the agreement is a true sale. When read in its entirety, however, all terms and provisions of the agreement, taken as a whole, confirm that the risk of non-payment or underpayment is borne entirely by Sunbelt and not shifted to Fidelity.

First, although the agreement purports to distinguish between sales of accounts "with recourse" to Sunbelt, and those "without

_____

[23] Id. at 1069.

8

recourse," in reality, Fidelity would virtually always have recourse against Sunbelt if Sunbelt's account debtors defaulted or underperformed. Sales of accounts without the prior written approval of Fidelity are "with full recourse to" Sunbelt. Although sales of accounts approved in writing by Fidelity (so-called "approved receivables") are nominally without recourse to Sunbelt, the parties apparently did not segregate, track, or otherwise distinguish these two categories of sales.[24]

Furthermore, the approved, non-recourse sales are qualified by two exceptions that are so significant that they essentially swallow non-recourse. First, Fidelity's "risk for approved receivables purchased without recourse is limited to [Sunbelt's] customer's financial inability to pay" — described in the agreement as "credit risk." In turn, "financial inability" is narrowly defined as

> (a) [Fidelity] becoming aware that the customer on or before the due date of the approved receivable in question made an assignment for the benefit of creditors, had a petition filed by or against it under the Federal Bankruptcy Code, called a general meeting of creditors to compromise or adjust its debts, had a proceeding instituted by or against it for debtor relief under any state or federal insolvency law; or
> (b) [Fidelity] becoming aware that the customer on or before the due date of the approved receivable in question was financially unable to pay as determined by [Fidelity] on the basis of evidence submitted by

---

[24] Fidelity's president, Charles Heflin, has stated in an affidavit that approximately $600,000 in sales were "without recourse," but did not compare or otherwise explain what portion of the approximately $4.3 million in total "sales" were with recourse.

9

[Sunbelt] or otherwise.

The agreement further provides that Sunbelt is responsible for the first $5,000 in losses for approved receivables and that all receivables in amounts less than $200 "shall always be deemed to be non-approved" and thus, with recourse to Sunbelt. These provisions make clear that, even after the "sale" of its accounts receivable, Sunbelt continued to have the risk of its customers' non-payment or underpayment; Fidelity's risk, in contrast, was limited to receivables purchased with recourse, and then only to the extent of any inability it might experience in collecting from these pre-approved account debtors.

In addition to the fact that Sunbelt retained virtually all risk of loss, other provisions in the agreement confirm that the parties confected — through a system of "advances" — a secured loan or revolving line of credit, rather than a true sale of assets. First, Fidelity agreed to advance Sunbelt up to 75% of the purchase price of the accounts and "charge [Sunbelt's] account therewith." Also, Fidelity was not required to make any advances on receivables purchased with recourse until payment was received from the account debtor; and even then, all advances were subject to Fidelity's right to "maintain a reasonable reserve" which may be "revised upward or downward" in Fidelity's "absolute discretion" at any time. Although these features might be common in factoring agreements, they too push this agreement ever closer to a loan and

10

further from a true sale.

We also note that the agreement required that Sunbelt grant Fidelity a "continuing lien and security interest in all of [its] accounts, instruments . . . and all proceeds of the foregoing as security for the payment and satisfaction of any and all of our present and future liabilities, indebtedness, and obligation[s] to you [Fidelity] . . . ." The parties also agreed that "[r]ecourse to any of the foregoing collateral shall not any time be required and we hereby authorize you [Fidelity] to charge or offset our account for the amounts of any and all of the liabilities, indebtedness, and obligation[s] which are secured thereby." And, under the agreement, Fidelity was to "treat all indebtedness" as "an entire single indebtedness for which [Sunbelt] shall remain liable for full payment without demand" and to which Fidelity may apply any "funds, receivables, credits, or property of [Sunbelt]."

Even further insulating itself from risk of loss, Fidelity obtained two additional security rights. First, Sunbelt's president, James Heffington, was required to execute a personal continuing guaranty, in which he "unconditionally guarant[eed] to Fidelity full payment and prompt and faithful performance by [Sunbelt] of all it's [sic] present and future indebtedness and obligations to Fidelity which may arise pursuant to the [factoring agreement]." Second, Fidelity filed a financing statement, in accordance with the Uniform Commercial Code, listing as collateral Sunbelt's "accounts, contract rights, instruments, documents,

11

chattel paper" and other "general intangibles" — not just the accounts receivable purportedly sold.[25]

In reaching our conclusion, we emphasize that "the distinction between purchase and lending transactions can be blurred,"[26] and therefore we expressly limit our holding to the facts and arguments presented in this admittedly close case. We also stress that our decision is guided by the policies behind PACA, which mandate protection of suppliers of fresh fruit and other perishable commodities. We express no opinion on the proper construction of factoring agreements in non-PACA contexts.

We are aware that factoring agreements may, and often do, incorporate <u>separate</u> lending or financing agreements,[27] yet the defendant in this case has never argued that the advances reflect a loan or line of credit <u>apart</u> <u>from</u> the sale of the accounts;[28]

---

[25] "Article 9 applies to sales of accounts and chattel paper primarily because of their financing character." JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 30-9, at 66 (4th ed. 1995).

[26] ASSET-BASED FINANCING: A TRANSACTIONAL GUIDE § 27.02[3], at 27-12 (Howard Ruda ed., 1985); <u>see</u> <u>also</u> WHITE & SUMMERS, UNIFORM COMMERCIAL CODE § 30-9, at 66 (describing factors as "lenders in sheep's clothing").

[27] <u>See</u>, <u>e.g.</u>, ASSET-BASED FINANCING: A TRANSACTIONAL GUIDE § 27.02[11], at 27-20 (explaining that "t]he factor can extend loans to the client before the payment date, or collection date . . . of the receivables . . . this is, conceptually, a second transaction separate and apart from the purchase of receivables").

[28] Fidelity consistently maintains that it "purchased accounts from Sunbelt for 75% and then 85% of the face value of invoices" thus disavowing any argument that the "advances" (and

12

significantly, Fidelity has not offered a satisfactory alternative explanation for all the risk-minimizing features, such as a "reserve account," Heffington's personal guaranty, and the lien and other security rights that are included in this agreement. Thus, in the final analysis, we conclude that the agreement these sophisticated business entities contemplated — and entered into — is a secured lending agreement and not a true sale.

Fidelity nevertheless seeks comfort in the Ninth Circuit's decision in <u>Boulder Fruit Express & Heger Organic Farm Sales v. Transportation Factoring, Inc.</u>[29] When reviewed in the light of our conclusion that Sunbelt's agreement with Fidelity constituted a secured lending arrangement, not a sale or factoring, however, <u>Boulder Fruit</u> proves to be inapt. In <u>Boulder Fruit</u>, the court held that "factoring agreements do not, per se, violate PACA"; rather, a "commercially reasonable sale of accounts for fair value is entirely consistent with the trustee's primary duty under PACA . . . to maintain trust assets so that they are freely available to satisfy outstanding obligations to sellers of perishable commodities."[30] Thus, the factoring agreement at issue in <u>Boulder Fruit</u>, providing for a sale of accounts receivable at 80% of their face value after deducting a 20% "factoring discount," was not

---

their accompanying interest rates) constitute a separate transaction.

[29] 251 F.3d 1268 (9th Cir. 2001).

[30] <u>Id.</u> at 1271 (internal quotations omitted).

13

commercially unreasonable and did not breach the PACA trust.[31]

As we conclude that the so-called factoring agreement in this case is the functional equivalent of a secured lending agreement, the Ninth Circuit's "commercially reasonable" analysis is inapplicable. The discrete issue before the Boulder Fruit court was whether an acknowledged factoring agreement was "commercially reasonable." Accordingly, that court did not apply a risk-transfer analysis (or any other test) to determine whether the agreement was a loan or sale. In this case, however, the key issue presented is whether the agreement is a true purchase at all, not simply, as Fidelity argues, whether a "purchase" of accounts for 75% of their face value is commercially reasonable. Because — in spite of its label — the agreement provided that Sunbelt and its owner, James Heffington, remained responsible for "any and all advances," we are constrained to conclude that the agreement was — for purposes of PACA — a secured loan, not a sale.

**C. Damages**

Fidelity also contends that the district court's grant of summary judgment was improper because the amount of damages owed to Reaves, if any, is a disputed issue of fact. Fidelity bases this argument on the affidavit and reports of its expert, certified

---

[31] Id. 1272. Significantly, however, the purchaser-factor of the accounts receivable in Boulder Fruit paid more for the accounts than he was ultimately able to collect, i.e., the PACA trustee received more for the accounts than they proved to be worth. Id.

14

public accountant Jill McKinney. According to Fidelity, McKinney's analysis establishes that (1) Sunbelt is owed at least $9,984.50 in "credits" for overpaid invoices and (2) Reaves was actually paid for all shipments to Sunbelt after Fidelity contracted with Sunbelt, but improperly applied these payments to outstanding balances owed on prior shipments. Fidelity concludes that even if its PACA liability is established, the amount of damages is a contested issue of material fact that requires vacating the grant of summary judgment.

We agree with the district court's determination that McKinney's affidavit, which focuses entirely on Sunbelt's past "payment history" and specifies invoices not at issue in this case, is irrelevant. We also question the utility of McKinney's "analysis" which is largely speculative and bereft of supporting documentation. In short, McKinney's expert testimony, without more, constitutes the type of "conclusional allegations" and "unsubstantiated assertions" that are never sufficient to defeat summary judgment.

We note also that the amount of PACA damages that Fidelity now challenges was conclusively established in the default judgment entered against Sunbelt in October, 2000. Fidelity does not dispute that it received PACA trust assets, only challenging the amount, if any, that Sunbelt owes Reaves on unpaid invoices — the precise issue determined in the default judgment. At the time of Sunbelt's default, Fidelity had been a party to this suit for several months

15

and was represented by Sunbelt's former counsel. Fidelity was well-aware of Sunbelt's default, yet did not contest that order, choosing instead to frame the issue broadly as a "material fact in dispute." We question, without deciding, whether this is the proper procedural vehicle to challenge the default judgment, if it indeed remains subject to challenge.

### III. Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.[32]

---

[32] Fidelity's "waiver and/or estoppel" argument, unsupported by case law, is entirely without merit and thus merits no discussion here.