PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

NICKEY GREGORY COMPANY, LLC;
POPPELL'S PRODUCE INCORPORATED,

*Plaintiffs-Appellees,*

v.

AGRICAP, LLC, a/k/a AgriCap
Financial Corporation,

*Defendant-Appellant.*

No. 09-1130

NICKEY GREGORY COMPANY, LLC;
POPPELL'S PRODUCE INCORPORATED,

*Plaintiffs-Appellants,*

v.

AGRICAP, LLC, a/k/a AgriCap
Financial Corporation,

*Defendant-Appellee.*

No. 09-1162

Appeals from the United States District Court
for the District of South Carolina, at Greenville.
Henry M. Herlong, Jr., Senior District Judge.
(6:07-cv-03605-HMH)

Argued: December 3, 2009

Decided: March 4, 2010

Before TRAXLER, Chief Judge, NIEMEYER, Circuit
Judge, and John Preston BAILEY, Chief United States
District Judge for the Northern District of West Virginia,
sitting by designation.

Affirmed in part, vacated in part, and remanded with instructions by published opinion. Judge Niemeyer wrote the opinion, in which Chief Judge Traxler and Judge Bailey joined.

---

## COUNSEL

**ARGUED**: Christoph Carl Heisenberg, TRAIGER & HINCKLEY, LLP, New York, New York, for AgriCap, LLC, a/k/a AgriCap Financial Corporation. Stephen P. McCarron, MCCARRON & DIESS, Washington, D.C., for Nickey Gregory Company, LLC, and Poppell's Produce Incorporated. **ON BRIEF:** Kirsten E. Small, NEXSEN PRUET, LLC, Greenville, South Carolina, for AgriCap LLC, a/k/a AgriCap Financial Corporation. Mary Jean Fassett, MCCARRON & DIESS, Washington, D.C., for Nickey Gregory Company, LLC, and Poppell's Produce Incorporated.

---

## OPINION

NIEMEYER, Circuit Judge:

Two sellers of perishable agricultural commodities, Nickey Gregory Company, LLC, and Poppell's Produce Inc., commenced this action under the Perishable Agricultural Commodities Act, 1930 ("PACA"), 7 U.S.C. §§ 499a-499t, to recover $106,696 owed them for the sale of produce to Robison Farms, LLC., a bankrupt South Carolina produce distributor. They named as defendant AgriCap, LLC, a finance company that provided secured financing to Robison Farms for working capital, and they demanded that AgriCap disgorge the proceeds of Robison Farms' accounts receivable held by AgriCap as collateral to secure repayment of monies advanced by AgriCap to Robison Farms. The two produce sellers claim that 7 U.S.C. § 499e(c)(2) created a trust for their benefit over the proceeds of their produce, including the

accounts receivable that Robison Farms used for collateral in its arrangement with AgriCap, and that they therefore had a superior interest in the accounts receivable and proceeds held by AgriCap.

AgriCap claimed that it purchased Robison Farms' accounts receivable under a traditional factoring agreement and that it therefore held no assets of Robison Farms that were subject to a PACA trust. It also asserted as a defense that it was a bona fide purchaser for value.

The district court rejected AgriCap's position and found that AgriCap's arrangement with Robison Farms was a lending arrangement secured by Robison Farms' accounts receivable. Accordingly, it concluded that AgriCap held the accounts receivable as part of the PACA trust, the assets of which had to be used to pay unpaid commodities sellers before any other creditor.

For the reasons that follow, we affirm the district court's conclusion that Robison Farms' accounts receivable were held by AgriCap as collateral for a loan and therefore were subject to a PACA trust, but we disagree with the amount that the district court required AgriCap to pay the commodities sellers. Accordingly, we affirm in part, vacate in part, and remand for a reassessment of damages in accordance with this opinion.

I

The Perishable Agriculture Commodities Act, which was enacted in 1930 to suppress unfair and fraudulent business practices in the marketing of perishable commodities, was amended in 1984 to provide unique credit protection to sellers of perishable agricultural commodities. Because sellers of perishable commodities had a need to move their inventories quickly, they were often required to become unsecured creditors of their purchasers, whose credit they were often unable

to verify. As these sellers of perishable commodities increasingly suffered the risk of the uncollectability of amounts owed by the purchasers, especially because the purchasers gave superior security interests to their lenders, Congress enacted the 1984 amendments to protect the commodities sellers by giving them a priority position over even secured creditors. As Congress explained:

> [*Purchasers* of perishable agricultural commodities] in the normal course of their business transactions, operate on bank loans secured by the inventories, proceeds or assigned receivables from sales of perishable agricultural commodities, giving the lender a secured position in the case of insolvency. Under present law, *sellers* of fresh fruits and vegetables are unsecured creditors and receive little protection in any suit for recovery of damages where a buyer has failed to make payment as required by the contract.

H.R. Rep. No. 98-543 ("House Report"), at 3 (1984), *reprinted in* 1984 U.S.C.C.A.N. 405, 407 (emphasis added). The House Report noted that the delay or nonreceipt of payment to perishable commodities sellers had increased substantially, creating a "burden on commerce." *Id.* at 3-4.

The 1984 amendments create, upon the sale of perishable agricultural commodities, a trust for the benefit of the unpaid sellers of the commodities on (1) the commodities, (2) the inventory or products derived from them, and (3) the proceeds of the inventory or products. 7 U.S.C. § 499e(c)(1)-(2); *see also* House Report at 3 (recounting congressional findings); *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 413 (5th Cir. 2003) (same). As amended, PACA requires that purchasers of perishable agricultural commodities maintain the trust by retaining the commodities or their proceeds until the commodities sellers are paid, and it makes it unlawful to "fail to maintain the trust as required." 7 U.S.C. § 499b(4). PACA confers jurisdiction on district courts to

entertain "actions by trust beneficiaries to enforce payment from the trust." *Id.* § 499e(c)(5).

The trust created by PACA is a "nonsegregated 'floating' trust" on perishable agricultural commodities and their derivatives until all sellers of such commodities are paid. 7 C.F.R. § 46.46(b). Because the governing regulations specifically contemplate the comingling of trust assets without defeating the trust, *see id.*, the trustee of such a trust is permitted to convert trust assets into other property, provided that the trustee honors its obligation to "maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities," *id.* § 46.46(d)(1). Any act inconsistent with maintaining the trust, including "dissipation" of trust assets, is deemed unlawful and a violation of PACA. *See* 7 U.S.C. § 499b; 7 C.F.R. § 46.46(d)(1). "Dissipation" is defined as "any act or failure to act which could result in the diversion of trust assets or which could prejudice or impair the ability of unpaid suppliers, sellers, or agents to recover money owed in connection with produce transactions." 7 C.F.R. § 46.46(a)(2).

PACA trusts thus give sellers of perishable agricultural commodities a right of recovery that is superior to the right of all other creditors, including secured creditors. 7 U.S.C. § 499e(c)(1). Indeed, in the event of bankruptcy, trust assets do not even become a part of the bankruptcy estate. *See Boulder Fruit Express & Heger Organic Farm Sales v. Transp. Factoring, Inc.*, 251 F.3d 1268, 1271 (9th Cir. 2001).

General trust principles govern PACA trusts unless the principle conflicts with PACA. *See Reaves Brokerage Co.*, 336 F.3d at 413; *Boulder Fruit Express*, 251 F.3d at 1271. Thus, when trust assets are held by a third party, resulting in the failure of the trustee to pay unpaid sellers of perishable agricultural commodities, the third party may be required to disgorge the trust assets unless the third party can establish that it has some defense, such as having taken the assets as a

bona fide purchaser without notice of the breach of trust. *See Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1067-68 (2d Cir. 1995); Restatement (Second) of Trusts § 284.

In this case, Nickey Gregory and Poppell's Produce claim to have been the beneficiaries of a PACA trust, the assets of which had been transferred to AgriCap, and therefore they seek disgorgement from AgriCap of those assets in amounts sufficient to pay them as unpaid sellers of perishable agricultural commodities.

II

Robison Farms, LLC., a South Carolina limited liability company that operated in Greenville, South Carolina, was, during the relevant periods, engaged in the business of distributing produce to restaurants and school systems in North Carolina and South Carolina. It purchased the produce from wholesalers who sold the produce to Robison Farms on credit under the protection of PACA's trust arrangement. Two of its suppliers, Nickey Gregory Company, LLC, and Poppell's Produce, Inc., who are the plaintiffs in this action, sold their produce to Robison Farms on a continuing basis, extending short term credit to Robison Farms "subject to the statutory trust authorized by [PACA]," as indicated on their invoices.

In early March 2005, when Robison Farms was experiencing financial difficulties, it applied to AgriCap, L.L.C., for financing to provide it with working capital "to restructure [its] payables." AgriCap approved a line of credit that was geared to the amount of Robison Farms' accounts receivable. As Robison Farms assigned accounts receivable to AgriCap, AgriCap advanced Robison Farms 80% of the face amount of the receivables, up to a limit of $500,000 outstanding at any given time. As AgriCap collected on the receivables, it retained the 80% amount and remitted the remaining 20% to Robison Farms, less its fees and interest for the period during

which its advances on the accounts receivable were outstanding.

To memorialize the arrangement, AgriCap and Robison Farms entered into (1) an agreement entitled "Factoring Agreement," which described in detail how AgriCap would advance funds against accounts receivable; (2) a "Security Agreement," granting AgriCap a blanket security interest in all of Robison Farms' assets; and (3) a "Subordination Agreement," subordinating all of Robison Farms' debts to the payment of the amounts that would become owed to AgriCap. In addition, Cindy Robison, the president and owner of Robison Farms, personally guaranteed Robison Farms' debts to AgriCap, and AgriCap filed a UCC-1 "Financing Statement," listing as collateral virtually all of Robison Farms' assets, including crops, inventory, and accounts receivable.

Notwithstanding this financing arrangement, Robison Farms continued to experience financial difficulties. Indeed, in May 2006, AgriCap noted that "[t]here are still quite a bit of past dues in the PACA payables." Even though the produce suppliers continued to deliver produce throughout the spring and early summer, Robison Farms stopped paying them on May 11, 2006, and on July 17, 2006, it closed its doors for business. The next day, July 18, 2006, AgriCap noted, in an internal memorandum written in response to Robison Farms' notice that it had closed its doors, "The company has been in a constant struggle due to heavy debt load." Less than a month later, Robison Farms filed a Chapter 7 bankruptcy petition to liquidate all of its assets.

After receiving a portion of the amounts owed them from the bankruptcy estate, Nickey Gregory and Poppell's Produce are still owed $66,411.25 and $40,284.61, respectively, for a total of $106,695.86, and Nickey Gregory is also owed attorneys' fees.[1]

---

[1] In its supply arrangement with Nickey Gregory, Robison Farms agreed to pay Nickey Gregory its attorneys' fees for the collection of PACA

At the time when Robison Farms stopped paying the produce suppliers—May 11, 2006—AgriCap was holding over $150,000 in face amount of Robison Farms' accounts receivable, and from May 11 until the date when Robison Farms closed its doors, AgriCap received additional accounts receivable from Robison Farms worth over $500,000 in face amount. When Robison Farms ceased doing business on July 17, AgriCap still held over $160,000 in Robison Farms' accounts receivable. AgriCap was able to convert nearly all of Robison Farms' accounts receivable into cash, which it used to repay itself without paying Nickey Gregory or Poppell's Produce.

Nickey Gregory and Poppell's Produce commenced this action against AgriCap, contending that the accounts receivable that AgriCap received from Robison Farms after May 11, 2006, were, under PACA, trust assets held by AgriCap for the benefit of unpaid commodities sellers such as them. *See* 7 U.S.C. § 499e(c). They allege that by not paying them, AgriCap wrongfully held assets in breach of the trust, incurring liability to them in the amount owed to them by Robison Farms—$106,695.06, plus Nickey Gregory's attorneys' fees.

Following a bench trial, the district court found in favor of the produce suppliers, entering judgment in their favor for $88,690.75, from which the court directed that Nickey Gregory also be paid its attorneys' fees. *Nickey Gregory Co. v. AgriCap, LLC*, 592 F. Supp. 2d 862 (D.S.C. 2008). The court

debts. The district court held that produce suppliers with the requisite attorneys' fees language on their invoices can collect reasonable attorneys' fees as "sums owing in connection with such transactions," under 7 U.S.C. § 499e(c)(2). *See Nickey Gregory Co. v. AgriCap, LLC*, 592 F. Supp. 2d 862, 878-79 (D.S.C. 2008) (citing *Coosemans Specialties, Inc. v. Gargiulo*, 485 F.3d 701, 708-09 (2d Cir. 2007); *Country Best v. Christopher Ranch, LLC*, 361 F.3d 629, 632 (11th Cir. 2004); *Middle Mountain Land & Produce, Inc. v. Sound Commodities, Inc.*, 307 F.3d 1220, 1224 (9th Cir. 2002)). AgriCap does not challenge this holding by the district court.

rejected AgriCap's contention that its relationship with Robison Farms was a traditional factoring agreement, under which it purchased Robison Farms' accounts receivable for a reasonable, discounted price, and that therefore the accounts receivable were no longer in the PACA trust, subject to the claims of produce suppliers. Rather, the court concluded that the arrangement was a loan arrangement, under which AgriCap was holding Robison Farms' accounts receivable as collateral. Thus, when AgriCap failed to pay Robison Farms' produce suppliers as beneficiaries of the PACA trust, the trust was breached, in violation of 7 U.S.C. § 499b(4). The court awarded damages of $88,690.75. The court determined that this figure represented the total of the "retained trust assets" held by AgriCap, calculated by subtracting the total amount that it loaned to Robison Farms in respect to those accounts from the total amount that AgriCap collected on Robison Farms' accounts receivable.

AgriCap filed this appeal, contending that the district court erred in rejecting its claim that the arrangement was a true factoring agreement not subject to PACA. It also contends that in any event it was a bona fide purchaser for value of the accounts receivable, providing it with a complete defense. Finally, it asserts that the district court erred in requiring it to disgorge the entirety of the "retained trust assets" and not merely the $16,339.49 in fees and interest that it retained after Robison Farms stopped paying produce suppliers on May 11, 2006.

The produce suppliers filed a cross-appeal, contending that the district court erred by not awarding them damages in the full amount of their claims against the PACA trust. They assert that the amount of accounts receivable that AgriCap held while they remained unpaid was more than sufficient to satisfy their claims.

## III

For its central argument, AgriCap contends that PACA did not prohibit Robison Farms from transferring PACA trust

assets to it, so long as the transfers were for fair value and therefore were commercially reasonable, because the Act creates liability only when trust assets are dissipated and the trust is thereby breached. AgriCap asserts that the question whether the transaction between it and Robison Farms was a loan or a sale, as addressed by the district court, was irrelevant to resolving whether the trust was breached. It maintains that the relevant question is whether the accounts receivable were transferred by Robison Farms to AgriCap in a commercially reasonable transaction. If they were, it argues, then the transaction did not violate PACA because PACA permits trust assets to be converted into other assets. It explains that PACA's prohibition against dissipation only "ensur[es] that assets are 'available' to satisfy obligations [of commodities sellers] [and] does not restrict the ability of the trustee to convert the trust assets into another form. Indeed, PACA contemplates that the trustee can convert the trust assets (the produce) into another form (cash, or a receivable)." It concludes accordingly that its transaction with Robison Farms was just that, a commercially reasonable transfer that was not prohibited.

This argument, however, is a straw man. Articulated in this form, the issue answers itself, as neither the statute nor any case law suggests that trust assets cannot be converted into a different form of assets.

Rather, to be successful, AgriCap's argument must also assume that the conversion of accounts receivable into cash was part of a true factoring arrangement because, in that case, Robison Farms would have relinquished its interest in the accounts receivable and received the cash in lieu of them. The assets of the trust would thus have been converted into cash and the receivables would no longer have been trust assets. Obviously, under this scenario, AgriCap would own the accounts receivable and would be able to do with them what it wished.

But if the accounts receivable were not *sold* but rather were given *as collateral* for a loan, then the accounts receivable would have remained trust assets, subject to AgriCap's security interest. Consequently, when AgriCap converted the receivables into cash, the cash would have become trust assets and, as a result, could not have been used first to pay back AgriCap the advances it had earlier made to Robison Farms along with interest and fees, because AgriCap's position with respect to that cash would have been subordinate to the claims of produce sellers while they remained unpaid. Thus, if the accounts receivable were held by AgriCap as collateral to secure repayment of a loan, they would also have been held for the benefit of produce sellers, and the produce sellers would have effectively enjoyed a first-creditor position in them.

This is precisely what the district court found in this case. Yet, AgriCap refuses to recognize the significance of the court's finding, attempting to relegate its relevance to only whether AgriCap is a bona fide purchaser for value. We agree with the district court that resolving the question of whether the transaction was a loan or a sale is central to determining AgriCap's PACA liability in this case.

At its core, PACA imposes a trust on commodities sold to produce distributors or dealers, such as Robison Farms, as well as the *proceeds of those commodities*, for the benefit of the commodities sellers. 7 U.S.C. § 499e(c)(2); 7 C.F.R. § 46.46(b). The trustee of this trust is required to maintain trust assets—the commodities themselves, the products of the commodities, or the proceeds from the sale of the commodities or products, *see* 7 U.S.C. § 499e(c)(2)—"in a manner that such assets are freely available *to satisfy outstanding obligations to sellers* of perishable agricultural commodities," 7 C.F.R. § 46.46.(d)(1) (emphasis added). And the commodities sellers' beneficial interest in the trust assets *while outstanding obligations exist* is superior to secured creditors of the trustee, even when the security interest of such creditors is explicitly

imposed on the perishable commodities, proceeds, and accounts receivable. *See Endico Potatoes, Inc.*, 67 F.3d at 1067.

When Congress made this policy choice to make the unsecured credit extended by commodities sellers superior to the position of lenders holding a security interest in those commodities and proceeds, it recognized the difficulty that lenders might have in administering their secured loans. Indeed, it received testimony to that effect from the American Bankers Association. In the end, however, Congress determined that those concerns were outweighed by other considerations:

> The Committee believes that the statutory trust requirements will not be a burden to the lending institutions. They will be known to and considered by prospective lenders in extending credit. The assurance the trust provision gives that raw products will be paid for promptly and that there is a monitoring system provided for under the Act will protect the interests of the borrower, the money lender, and the fruit and vegetable industry. Prompt payment should generate trade confidence and new business which yields increased cash and receivables, the prime security factors to the money lender.

House Report at 4.

Thus, when Robison Farms purchased perishable agricultural commodities from the sellers in this case, the commodities and the proceeds from them became assets of the PACA trust, to be maintained to pay the sellers' loans *before* payment of any other loan, whether secured or not. As relevant to this case, in May 2006, when the invoices of the commodities sellers went unpaid, the accounts receivable generated from the resale of the commodities to the school systems and restaurants, being proceeds of the commodities, were PACA

trust assets that had to be maintained for payment *first* to the unpaid commodities sellers.

If Robison Farms had transferred these trust assets to Agri-Cap by means *of a sale* in exchange for cash, the transaction would have been nothing more than a permissible conversion of trust assets from one form to another—*i.e.*, from accounts receivable into cash. Following this form of transaction, the accounts receivable would no longer have remained trust assets, and the commodities sellers would not have had any claim for payment from them. Thus, AgriCap would have been entitled to collect on the accounts receivable and to retain the proceeds without interference by Nickey Gregory and Poppell's Produce.

But if, in contrast, Robison Farms had transferred the accounts receivable to AgriCap *as collateral for a secured loan*, the receivables and their proceeds would have remained trust assets, even though held by AgriCap. As AgriCap has asserted, such a transfer again is permitted by PACA. But PACA provides that any security interest so created would be subject to the interest of unpaid commodities sellers. More-over, the commodities sellers' interest in the assets would not have been affected by how much the secured lender loaned against those assets to the trustee or by how much the trustee paid the lender back. The commodities sellers' interest would have been in the collateral and would have been superior to the lender's interest.

It is therefore highly relevant to the disposition of this case to determine whether Robison Farms' accounts receivable were indeed *sold* for value to AgriCap under a factoring agreement or whether they were simply subjected to a secur-ity interest *to collateralize a loan* that AgriCap made to Robi-son Farms. If the accounts receivable were only subjected to a security interest, then the security interest was subordinate to the prior statutory trust created for the benefit of the com-modities sellers.

Following a bench trial, the district court found that "the Agreement between AgriCap and Robison Farms [was] actually a loan secured by accounts receivable." *Nickey Gregory Co.*, 592 F. Supp. 2d at 877. The court reached this conclusion because it found that throughout the transaction Robison Farms bore all of the risks of nonpayment on the accounts receivable. It reasoned that if Robison Farms had actually sold the accounts receivable to AgriCap, then AgriCap would have borne the risks of nonpayment of the receivables, and Robison Farms would have received the price paid for the receivables as trust assets.

While AgriCap does not in its brief address the significance of the district court's holding, it does maintain that it was the *purchaser* of the accounts receivable for value and that therefore the accounts receivable were no longer trust assets. Inherently, this argument also includes the argument that the transaction was not a loan arrangement in which the accounts receivable were provided simply as collateral. We now turn to resolve that question, whether the district court erred in concluding that this was a loan arrangement.

IV

AgriCap characterizes the transaction between it and Robison Farms as a contract of sale under which it purchased Robison Farms' accounts receivable for 80% of the receivables' face value plus deferred payments to be made after collection on the accounts receivable in the amount of the remaining 20%, less interest and fees. It claims that after each exchange the receivable no longer remained an asset of the PACA trust. Because a PACA trust is nonsegregated and "floating," *see* 7 C.F.R. § 46.46(b), a trustee does not breach the trust by selling trust assets for value, provided the value the trustee received is "commercially reasonable," *see Boulder Fruit Express*, 251 F.3d at 1271-72. As the accounts receivable themselves were no longer trust assets, AgriCap

concludes that the commodities sellers had no right to recover from them.

Numerous indicators in the transaction's documentation support AgriCap's characterization. First, the principal document describing the relationship between the parties and their rights and duties was denominated "Factoring Agreement," which traditionally involves the *sale* of accounts receivable at a discounted price. *See Black's Law Dictionary* 671 (9th ed. 2009) (defining factoring as "[t]he buying of accounts receivable at a discount"). Under the traditional form of such an agreement, the seller gives up the possibility of receiving the face value of the accounts receivable to have a discounted but unconditional sum certain in hand. The purchaser assumes the risk of collection, betting that its success in collecting on the accounts receivable will yield a return exceeding the discounted price it paid for the asset. If it is completely successful in collecting the accounts, it recovers not only the price it paid to the seller, but also an additional amount representing the difference between the price it paid and the face amount of the receivable. On the other hand, if the receivable proves uncollectible or uncollectible in part, the purchaser bears the loss.

In addition to the title of the principal document, language sprinkled throughout the Factoring Agreement referred to AgriCap as the "buyer," Robison Farms as the "seller," and the transaction as a "purchase" or "sale." And, consistent with this usage, the document contained warranties that traditionally accompany the sale of an asset.

Looking at the Factoring Agreement substantively, at least at a general level, one could characterize it as involving the sale of accounts receivable at a price amounting to 80% of their face value and, after collection, an additional payment calculated by subtracting from 20% of their face value the purchaser's costs for collection and the costs for the seller's use of the money during the period between the initial transfer

of each account receivable and collection on it. This is the characterization advanced by AgriCap to support its claim that the accounts receivable in this case were sold to it and no longer remained in the PACA trust.

Relying on only these superficial indicators, however, amounts to a serious oversimplification of the transaction that overlooks its substance, as the district court recognized. A closer examination of the transaction's documentation demonstrates that, as the district court found, the transaction was a loan transaction.

*First*, the Preliminary Term Sheet, which AgriCap prepared before the transaction and sent to Robison Farms for the purpose of describing the transaction and receiving Robison Farms' assent to it, described a "credit" facility up to the lesser of $500,000 or 80% of Robison Farms' accounts receivable. The document referred to AgriCap as the "Lender" and Robison Farms as the "Borrower." It also described the "interest on advances" (the lesser of 12% or 6% over prime) and the required collateral. Finally, the document specified that the purpose of the credit facility was "to fund Borrower's working capital needs." Remarkably, this Preliminary Term Sheet, which succinctly described the entire transaction, recognized that the accounts receivable were part of a PACA trust subject to claims by produce suppliers, as the document required "reserves [of accounts receivable] as deemed appropriate from time to time in AgriCap's sole discretion . . . to cover past due balances due from vendors covered under the PACA Trust."

*Second*, under the terms of the documents, Robison Farms did not enter into a traditional factoring arrangement in the sense that it transferred the risk of the noncollection of the accounts receivable to AgriCap. Rather, under the transaction, virtually all of the risk of noncollection remained with Robison Farms. The Factoring Agreement ensured that AgriCap

had almost total recourse against Robison Farms if a receivable went unpaid. Section 4.1 provided:

> [Robison Farms] agrees to pay [AgriCap], on demand, the full face amount, or any unpaid portion of, any [account receivable]:
>
> (a)    which remains unpaid for the Payment Period unless, prior to the duration of the Payment Period, the subject Account Debtor has become Insolvent; or
>
> (b)    with respect to which there has been any breach o[f] warranty or representation set forth in Section 6 of this Agreement or any breach of any covenant contained in this Agreement; or
>
> (c)    with respect to the Account Debtor asserts any Dispute which remains unsettled thirty (30) days after the due date of such [account receivable].

Under this provision, AgriCap had the right to demand that Robison Farms "repurchase" any receivable that went unpaid or was disputed, unless the account debtor became insolvent. Accordingly, unpaid invoices would ultimately be returned to Robison Farms except in the instance where an account debtor's insolvency occurred during the pendency of the invoice.

But even the risk associated with the account debtor's insolvency was not likely to fall on AgriCap. Under Section 6.1(g) of the agreement, Robison Farms warranted:

> At the time that [AgriCap] makes an Advance relating to [an account receivable], none of the Account Debtors set forth in the Schedule of Accounts is Insolvent and Seller has no knowledge that the

Account Debtors are Insolvent or may become Insolvent within the Payment Period.

Thus, in conjunction with Section 4, AgriCap could require Robison Farms to repurchase a receivable if Robison Farms had knowledge that the debtor on that receivable was insolvent or might become insolvent within the payment period. In this manner, whatever transfer of risk was associated with the possibility of an intervening insolvency under Section 4.1 was virtually negated by Section 6.

Insofar as the most likely reasons for nonpayment by an account debtor would be that it did not have the money or that it disputed the debt, the district court was justified in finding that the agreement between the parties in this case effectively insulated AgriCap from loss and was therefore a loan rather than a factoring sale. *See Reaves Brokerage Co.*, 336 F.3d at 414-16 (examining a similar purported "factoring" arrangement and finding that provisions preventing the transfer of risk rendered the agreement a loan and not a sale).

*Third*, other documents in the transaction indicated that the transaction was a loan, in which the accounts receivable were held by AgriCap as collateral for repayment of the advances made to Robison Farms as loans. The Security Agreement executed by the parties referred to Robison Farms as the "debtor" and AgriCap as the "secured party," and it gave AgriCap a *security interest* in virtually all of Robison Farms' assets—including crops, inventory, and accounts receivable—to secure repayment of Robison Farms' obligations under the Factoring Agreement. The Security Agreement also referred to the Factoring Agreement as "the Loan Agreement," and the obligations under the Security Agreement were triggered by Robison Farms' failure to pay the "Debt."

*Fourth*, in addition to the Security Agreement, the parties entered into a Subordination Agreement, in which Robison Farms subordinated its other debts "to the payment in full of

AgriCap Indebtedness" and gave AgriCap "a first priority security interest in the Collateral."

*Fifth*, treating AgriCap's money advances to Robison Farms as loans, Cindy Robison, the owner of Robison Farms, gave AgriCap a personal guarantee for the "full payment . . . of any obligations under the Factoring Agreement with regard to . . . the advances . . . including all interest and other charges stated therein."

And *sixth*, AgriCap filed a UCC-1 Financing Statement with respect to the transaction, claiming liens in all of Robison Farms' assets to secure "the prompt and full payment and performance of Secured Obligations." That document again referred to Robison Farms as "the Debtor."

Thus, the transaction is more accurately characterized as a revolving line of credit, secured by accounts receivable and other assets, and repaid from monies collected by AgriCap on the receivables. When Robison Farms transferred a receivable to AgriCap, AgriCap advanced, as a loan, 80% of the receivable's face value. When AgriCap collected on the receivable, as it was hired to do, it retained (1) 80% as repayment of the loan; (2) a collection fee of 1.5%; and (3) interest at a rate of the lesser of 12% or 6% over prime for the period during which the 80% amount was outstanding. It then remitted the balance to Robison Farms. AgriCap was thus only a lender and collection agent, not a purchaser of the accounts receivable that assumed the risks of collecting on the receivables. Because these substantive aspects of the transaction are inconsistent with an outright sale of the assets, we agree with the district court that the transaction was in its essence a loan in the form of a revolving line of credit secured by accounts receivable.

As already noted, the distinction between a sale and a loan controls the issue of whether AgriCap *purchased* the assets free of the PACA trust or merely *held* the assets to collateral-

ize its loans to Robison Farms, in which case the receivables would have remained subject to the PACA trust and would have been required, by the terms of regulations, to be made "freely available" to pay obligations to commodities sellers. 7 C.F.R. § 46.46(d)(1). Because we conclude that the transaction in this case was a loan, we also conclude that the accounts receivable and their proceeds never left the PACA trust and that therefore the accounts receivable and their proceeds had to be made available for payment *first* to the claims of unpaid PACA creditors, such as Nickey Gregory and Poppell's Produce. The district court therefore ruled properly that AgriCap must disgorge from the assets of the PACA trust amounts sufficient to pay unpaid PACA creditors. *See Endico Potatoes, Inc.*, 67 F.3d at 1069.

AgriCap nonetheless contends that even if the transaction was a loan, no provision of PACA prohibits the trustee from granting a security interest in trust assets to collateralize a loan. While we agree with this proposition, its accuracy does not advance AgriCap's position. It was not the creation of a security interest in the accounts receivable that subjected AgriCap to liability but rather its collection on them and payment of the proceeds to itself ahead of the commodities sellers. It is not disputed that, in this case, AgriCap used its position as collection agent and lender to satisfy Robison Farms' obligations to it ahead of Robison Farms' obligations to its PACA creditors. It was this use of trust assets to pay itself before paying commodities sellers that amounted to a violation of PACA, even though the payments were authorized by the arrangement with Robison Farms. Under PACA, Robison Farms was obligated to ensure that trust assets remained freely available to pay PACA creditors first. *See* 7 U.S.C. §§ 499(b)(4), 499e(c)(2); 7 C.F.R. § 46.46(a)(2). Yet, through its arrangement with AgriCap, it authorized trust assets to be used to repay AgriCap ahead of the commodities sellers, who went unpaid. Since the arrangement and the transactions under it breached the PACA trust, AgriCap, as a third-party transferee of the trust assets, must, under estab-

lished trust principles, disgorge the proceeds of the receivables unless it has a defense.

Finally, AgriCap contends that whether the transaction was a loan is not important so long as the transaction was commercially reasonable. For this proposition, it relies on *Boulder Fruit Express*, 251 F.3d at 1272, where the Ninth Circuit found that a particular factoring arrangement was "commercially reasonable" and not in violation of the PACA trust, as well as a trilogy of cases from the Second Circuit holding that a trustee did not breach the PACA trust by establishing with a bank a checking account with overdraft privileges, which effectively functioned as a revolving line of credit. *See D.M. Rothman & Co. v. Korea Commercial Bank of N.Y.*, 411 F.3d 90 (2d Cir. 2005); *E. Armata, Inc. v. Korea Commercial Bank of N.Y.*, 367 F.3d 123 (2d Cir. 2004); *Am. Banana Co. v. Republic Nat'l Bank of N.Y., N.A.*, 362 F.3d 33 (2d Cir. 2004).

First, *Boulder Fruit Express* is inapposite. That case involved a true factoring relationship, in which the receivables were actually sold to the factor. Thus, unlike in this case, the receivables no longer remained PACA trust assets.

The Second Circuit's cases involving checking accounts with overdraft privileges are also distinguishable. In those cases, PACA creditors sued commercial banks, in which PACA dealers had checking accounts with overdraft privileges, to recover unpaid amounts for produce delivered to the PACA dealers. The PACA creditors argued that because the accounts were perpetually overdrawn and replenished by incoming checks made payable to the dealers, the overdraft privileges effectively functioned as revolving lines of credit in which the banks were paid ahead of the PACA creditors. The PACA creditors sought disgorgement from the banks of the amounts necessary to pay their debts. The Second Circuit rejected the PACA creditors' claims, reasoning that it was not possible for a PACA dealer to do business without a commercial checking account with a bank and that it was never antici-

pated that banks would have to ensure that commercial checking account holders maintain reserves sufficient to satisfy PACA creditors. *See, e.g.*, *E. Armata, Inc.*, 367 F.3d at 134 ("[I]t is difficult to imagine how a PACA trustee would make funds available to its PACA creditors without entering into some relationship with a bank"). Moreover, the Second Circuit in those cases pointed out that, rather than rendering PACA trust assets less than "freely available" or "impair[ing]" payment to PACA creditors, allowing checking accounts with overdraft protection would likely make assets *more* readily available to pay PACA creditors. *Id.* at 133-34 ("[M]aintaining a checking account . . . may facilitate, rather than impede, the fulfillment of a PACA trustee's duty to maintain trust assets so that they are freely available to satisfy outstanding obligations to sellers of perishable commodities" (internal quotation marks and citations omitted)); *cf. Am. Banana Co.*, 362 F.3d at 42 ("The imposition of liability [on the bank] . . . would . . . run the serious risk of complicating —if not eliminating altogether—overdraft procedures that directly benefit PACA beneficiaries").

It might be argued that these cases carve out a narrow exception to PACA for bank checking accounts with overdraft privileges, although the Second Circuit believed that its holdings were facilitating the prompt payment of PACA creditors and therefore were consistent with PACA. We do not, however, determine here whether we agree with the Second Circuit's interpretation addressing whether PACA imposes a trust on bank checking accounts. Even were we to follow the Second Circuit, however, we could find its reasoning persuasive only insofar as its holdings apply to bank checking accounts that are subject to banking rules and regulations. To apply the cases more broadly to general credit arrangements would undoubtedly conflict with the purpose and effect of PACA. In creating PACA trusts, Congress clearly had in focus general credit arrangements with lenders, including banks, and determined to subordinate their positions, even when secured by inventory and proceeds, to the credit posi-

tions of commodities sellers, even when unsecured and later in time. *See*, *e.g.*, House Report at 4. Because the circumstances before us do not involve bank checking accounts, we conclude that these Second Circuit cases are not applicable here.

Accordingly, we affirm the district court's conclusion that AgriCap held PACA trust assets at a time when PACA creditors went unpaid in violation of the trust. As a third-party transferee of trust assets, AgriCap must therefore disgorge those assets unless it can establish a defense.

V

AgriCap contends that it has a complete defense to liability as a bona fide purchaser ("BFP") because it received PACA trust assets (1) in exchange for value and (2) without notice of the breach of the trust. Recognizing that trust principles are applicable in enforcing PACA, at least to the extent not inconsistent with PACA, *see Reaves Brokerage Co.*, 336 F.3d at 413; *Boulder Fruit Express*, 251 F.3d at 1271, AgriCap relies on the Restatement (Second) of Trusts § 284(1), which provides:

> If the trustee in breach of trust transfers trust property to, or creates a legal interest in the subject matter of the trust in, a person who takes for value and without notice of the breach of trust, and who is not knowingly taking part in an illegal transaction, the latter holds the interest so transferred or created free of the trust, and is under no liability to the beneficiary.

This argument, however, fails to take into account the limitations to the BFP defense that exist with regard to both the requirements that the party take "for value" and that it take "without notice."

First, AgriCap cannot assert reasonably that it was without knowledge of unpaid obligations to PACA creditors. When AgriCap entered into the transaction, it reserved the right to require Robison Farms to reserve sufficient amounts of accounts receivable, as determined by AgriCap in its "sole discretion," to "cover past due balances due from vendors covered under the PACA trust." AgriCap also reserved the right to "perform field exams on a periodic basis, as determined in AgriCap's sole discretion." In its first examination of Robison Farms' financial circumstances, conducted days before the transaction was consummated, AgriCap noted that accounts payable to PACA creditors had an average age of 68 days when their terms required payment within 30 days or within a shorter period and that past due accounts (with an age of over 90 days) constituted 12% of the accounts payable. The Factoring Agreement itself required as a condition: "*PACA Payables*. Arrangement satisfactory to [AgriCap] shall have been made for the direct payment of certain trade payables designated by [AgriCap] from the proceeds of the Purchased Receivables." The president of AgriCap acknowledged in his affidavit that AgriCap was concerned about PACA creditors and monitored the situation to ensure that there were "no PACA lien issues." And in May 2006, after it had reviewed Robison Farms' books, AgriCap observed that "[t]here are still quite a bit of past dues in the PACA payables." Yet, during the period when PACA creditors were not being paid and even after Robison Farms went out of business and closed its doors on July 17, 2006, AgriCap continued to collect on Robison Farms' accounts receivable, using the proceeds to pay itself ahead of the PACA creditors while knowing that the PACA creditors were unpaid. From May 11, 2006 (when Robison Farms stopping paying these PACA creditors), until September 5, 2006 (when AgriCap completed collection on the accounts receivable), AgriCap held and collected on $668,387 of Robison Farms' accounts receivable, and from July 17, 2006 (when Robison Farms went out of business), until September 5, 2006, AgriCap held and collected on $162,070 of Robison Farms' accounts receivable.

Either of these amounts was more than sufficient to pay Nickey Gregory and Poppell's Produce in full. AgriCap cannot, accordingly, claim to be without notice of the breach of the PACA trust. *See* Restatement (Second) of Trusts § 297 ("A person has notice of a breach of trust if he knows or should know of the breach of trust").

Second, AgriCap contends that it received Robison Farms' accounts receivable "for value" because each time Robison Farms transferred a receivable to AgriCap, AgriCap paid Robison Farms 80% of the receivable's face value. This argument, however, fails for the same reason that AgriCap is incorrect to characterize the transaction as a sale rather than a loan. AgriCap did not *purchase* the account receivable but merely held it as collateral for the 80% loan and as collection agent. It therefore was not a purchaser for value, having never become owner of the receivable.

The district court properly rejected AgriCap's BFP defense.

VI

Both AgriCap and the commodities sellers, Nickey Gregory and Poppell's Produce (by cross-appeal), contend that the district court erred in determining damages.

The district court entered an award in favor of the commodities sellers in the amount of $88,690.75. The court reasoned that AgriCap could only be liable in the amount of trust assets that it "retained" in violation of the trust and that imposing greater liability would elevate AgriCap's liability over that of Robison Farms. To arrive at the amount of trust assets AgriCap retained, the court took the total amount that AgriCap had collected on the receivables, $4,053,596.21, and deducted the amount that AgriCap paid to Robison Farms on those receivables, $3,964,905.46, arriving at the $88,690.75 figure.

AgriCap contends that it should be required to disgorge only $16,339.49, the amount it received in interest and fees

after May 11, 2006, when Robison Farms first failed to pay the PACA creditors' invoices. Nickey Gregory and Poppell's Produce contend that they are entitled to disgorgement of the entire amount of their PACA claims—$106,695.86, plus Nickey Gregory's attorneys' fees—because AgriCap held a sufficient amount of trust assets to pay the full amount.

The problem with the district court's damages calculation is that it effectively conceptualized AgriCap's receipt of the accounts receivable and their proceeds as a purchase, rather than a loan, by offsetting AgriCap's payments to Robison Farms against what it collected on the receivables. If, however, the transaction was a loan transaction, as the district court concluded and as we affirm, then the amounts loaned to Robison Farms would not reduce the value of the collateral held by AgriCap, which always remained trust assets. The accounts receivable and their proceeds never ceased to be assets of the trust, and AgriCap's use of the proceeds of the accounts receivable to pay itself ahead of the commodities sellers was in violation of the trust. Permitting AgriCap to retain collections on the receivables after Robison Farms had ceased to pay its PACA creditors would effectively elevate AgriCap's position, as a secured lender, above the PACA creditors' position, contrary to PACA's requirement that the funds go first to pay PACA creditors.

Nickey Gregory and Poppell's Produce rightly contend that AgriCap is required to disgorge receivables in full satisfaction of their claims, inasmuch as the value of the receivables in the PACA trust after May 11, 2006, always exceeded the amount of their claims. According to AgriCap's records, it received over $668,000 in Robison Farms' accounts receivable after May 11, 2006, when Robison Farms stopped paying the PACA creditors. All of these assets were subject to the superior interests of the unpaid PACA creditors, and to the extent that Robison Farms' agreement with AgriCap resulted in the payment of the proceeds of those accounts receivable to Agri-

Cap ahead of those PACA creditors, the trust was breached.[2] *See* 7 U.S.C. § 499e(c)(2).

Accordingly, we vacate the district court's damage award and remand with instructions that the district court award Nickey Gregory and Poppell's Produce the full amount of their unpaid balance, including Nickey Gregory's reasonable attorneys' fees.

## VII

We recognize that applying the provisions of PACA in this case raises genuine concerns, indeed frustration, for AgriCap and lenders such as AgriCap, who, in providing operating capital to small businesses in need, anticipate a level of protection from their secured creditor positions. Their efforts, however, are trumped by Congress' policy choice to give produce suppliers a favored creditor position, not only in the produce they sell, but also in derivative products and comingled proceeds in the hands of PACA dealers, which subordinates the lenders' secured position in those assets. This reordering of priorities, not unlike what is done in the Bankruptcy Code, could perhaps lead to adjustments by lenders in the PACA context who might find it necessary to raise their prices for money, alter their lending practices, or even hesitate to extend credit, ultimately weakening a link in the chain of agricultural commerce. The judiciary, however, should not insert itself in

---

[2]As we have noted, because the accounts receivable and their proceeds were trust assets, the unpaid commodities sellers have a prior interest in them and can recover from AgriCap to the full satisfaction of their debts up to the limit of trust assets held while they remained unpaid. Of course, AgriCap returned some of the trust assets to Robison Farms in the form of cash collected on the accounts receivable in the amount of 20% of the receivables less fees and interest. Accordingly, it cannot be required to disgorge these amounts so returned. Even after this deduction, however, the total amount of trust assets held by AgriCap well exceeded the amounts necessary to satisfy Robison Farms' debts to Nickey Gregory and Poppell's Produce.

these policy matters by questioning or debating legislative judgments, as it is constituted only to comprehend, interpret, and apply what Congress has duly provided.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED WITH INSTRUCTIONS*