IKUTA, Circuit Judge, with whom HURWITZ and FRIEDLAND, Circuit Judges, join, dissenting: Congress enacted the Perishable Agricultural Commodities Act (PACA) trust, 7 U.S.C. § 499e(c), to solve a simple problem. Most produce growers sell their products to distributors on credit. If the distributor goes bankrupt, the growers are mere unsecured creditors and may only get cents on the dollar. The distributor’s secured creditors, by contrast, get first crack at the distributor’s assets. To address this problem, PACA made the distributor a trustee, the growers beneficiaries, and the growers’ produce (and any resulting proceeds) trust assets. Congress thus ensured that in bankruptcy, the proceeds from the sale of the growers’ produce would be available to pay off the growers. The appeal before us today poses a related scenario: If a PACA trustee borrows money from a lender (using the trust assets as collateral) in order to pay the growers, but the money runs out before all the growers are paid, does the lender have an obligation to make the unpaid growers whole? The majority says yes: if the trustee fails to reimburse the growers, the lender is on the hook. The majority posits that the growers have a priority lien on their produce, which allows the trust to accept the benefit of a loan agreement but disregard the obligation to repay it. Because this surprising conclusion is unm-oored from both the text of PACA and settled principles of trust law, I dissent. I Congress initially enacted PACA, 7 U.S.C. §§ 499a-499t, in 1930 to protect growers who marketed and sold their produce through intermediaries. PACA did not originally make growers beneficiaries of a trust. Rather, it required all intermediary distributors — commission merchants, dealers, and brokers — to operate under licenses issued by the Secretary of Agriculture. 7 U.S.C. §§ 499c, 499d (1930). PACA also prohibited these distributors from engaging in a number of unfair business practices, such as failing to make prompt and full payment to growers. Id. §§ 499b, 499e. Over time, it became evident that PACA gave growers insufficient protection when distributors went bankrupt. H.R. Rep. No. 98-543, at 3 (1983), as reprinted in 1984 U.S.C.C.A.N. 405, 407. As the House Committee explained in its report on the proposed 1984 Amendments, sales of perishable goods “must be made quickly or they are not made at all.” Id. As a result, produce growers are usually compelled to sell their goods on credit, even though it is “often difficult to make credit checks, conditional sales agreements, and tak[e] other traditional safeguards.” Id. This led to especially harsh consequences when distributors went bankrupt. Distributors typically operate “on bank loans secured by the inventories, proceeds or assigned receivables from sales of perishable agricultural commodities.” Id. Before Congress intervened, a distributor could give the lender a security interest in all its assets, including the produce it had purchased from growers on credit and accounts receivable it received from the sale of the produce to retailers. If the distributor went bankrupt, the lender would have a secured claim in everything the distributor owned. In contrast, the growers would be “unsecured creditors and receive little protection in any suit for recovery of damages where a buyer has failed to make payment as required by the contract.” Id. The unsecured growers would often receive only cents on the dollar on the distributor’s unsecured IOUs. See A Bill to Amend the Perishable Agricultural Commodities Act, 1930: Hearing on S. 2052 Before the Subcomm. on Agric. Prod,, Mktg. & Stabilization of Prices of the S. Comm, on Agrie., Nutrition & Forestry, 98th Cong. 14 (1983) (statement of Keith Eckel, President, Pennsylvania Farmers’ Association, on behalf of American Farm Bureau Federation). A bankruptcy court could even recapture payments the distributor had made to a grower within 90 days of a bankruptcy and use them to pay other creditors. Id.; see also 11 U.S.C. § 547. In light of this concern, Congress added a trust mechanism to PACA in 1984. H.R. Rep. No. 98-543, at 4. The 1984 Amendments’ operative trust provision, 7 U.S.C. § 499e(c)(2), requires a distributor to hold “perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products ... in trust for the benefit of all unpaid suppliers or sellers” until the distributor makes full payment to its growers.[1] This means that the distributor is a trustee, the growers’ produce (and all proceeds from sales of the produce) are the trust res, and the growers are beneficiaries. A We “apply general trust principles to questions involving the PACA trust, unless those principles directly conflict with PACA.” Boulder Fruit Express & Heger Organic Farm Sales v. Transp. Factoring, Inc., 251 F.3d 1268, 1271 (9th Cir. 2001); see also Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc., 67 F.3d 1063, 1067 (2d Cir. 1995). Like other circuits, we have turned to the Restatement of Trusts for those principles.[2] See, e.g., Nickey Gregory Co. v. AgriCap, LLC, 597 F.3d 591, 605-06 (4th Cir. 2010); Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co., 336 F.3d 410, 413-14 & nn.17-18 (5th Cir. 2003); Boulder Fruit, 251 F.3d at 1271-72; Endico Potatoes, 67 F.3d at 1067-68; Consumers Produce Co. v. Volante Wholesale Produce, Inc., 16 F.3d 1374, 1380 (3d Cir. 1994); C.H. Robinson Co. v. Tr. Co. Bank, N.A., 952 F.2d 1311, 1313-14 (11th Cir. 1992). Two key principles of trust law are crucial to understanding the trust mechanism in PACA. First, by making the distributor a trustee and the growers’ produce and the proceeds trust assets, Congress transformed how these assets are treated in bankruptcy. A PACA trustee-distributor wears two hats in a bankruptcy proceeding. All of the debtor’s own assets are subject to the claims of its creditors. But the trust assets do not belong to the debt- or; the distributor as trustee holds only a nonbeneficial, bare legal title to such assets. Restatement (Third) of Trusts § 42 (Am. Law Inst. 2003). Therefore, the trust assets are not part of the debtor’s bankruptcy estate. See 11 U.S.C. § 541(b), (d); United States v. Whiting Pools, Inc., 462 U.S. 198, 205 n.10, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983) (“Congress plainly excluded property of others held by the debt- or in trust at the time of the filing of the petition” from the bankruptcy estate.); Sunkist Growers, Inc. v. Fisher, 104 F.3d 280, 282 (9th Cir. 1997); Restatement (Third) of Trusts § 42 cmt. c (“[T]he trustee’s personal creditors or trustee in bankruptcy may not reach either the trust property or the trustee’s nonbenefícial interest therein.”). Second, by making the distributor a trustee of the PACA trust, Congress authorized the distributor to manage the produce and any resulting assets for the growers’ benefit, subject to the standards that govern trustees.[3] Under basic trust principles, a trustee has the same powers over trust property as any other owner of property, “except as limited by statute or the terms of the trust,” id. § 85; accord Unif. Trust Code § 815 (Unif. Law Comm’n 2000). This includes the authority “to sell trust property ... in exchange for other property,” Restatement (Third) of Trusts § 86 cmt. c, and the “power to borrow money for trust purposes and to pledge, mortgage, grant a deed of trust, or otherwise encumber trust property,” id. § 86 cmt. d. Any money obtained from such transactions becomes an asset of the trust estate. Third-party lenders or purchasers dealing with a trustee generally hold the assets or security interest free of the trust. See Restatement (Second) of Trusts § 283 (Am. Law. Inst. 1959).[4] The buyer or lender has no duty to “ensure that assets transferred to the trustee are properly applied to trust purposes.” Restatement (Third) of Trusts § 108(3)(b). Even when the trustee breaches its fiduciary duty, someone who “takes for value and without notice of the breach of trust,” is a “bona fide” transferee, “holds the interest so transferred or created free of the trust, and is under no liability to the beneficiary.” Restatement (Second) of Trusts § 284.[5] There is an important exception to this rule. If (1) the trustee breaches its fiduciary duties when selling a trust asset or granting a security interest in a trust asset, and (2) the third party is on notice of this breach, the third party does not take the asset or security interest free of the trust. Restatement (Second) of Trusts § 288. Rather, the third party takes the asset in “a constructive trust for the beneficiary of the trust,” id. § 288 cmt. a., and may be compelled to restore the asset or any proceeds derived from it, id. § 291(1).[6] A trustee may breach its fiduciary duties by failing to “exercise caution ... care and skill in deciding whether and under what terms to borrow money for trust purposes or to grant a security interest in trust property,” Restatement (Third) of Trusts § 86 cmt. d, or by acting in a similarly careless manner when selling trust property, id. § 86 cmts, b, c. Therefore, a trustee breaches its fiduciary duty if it enters into an agreement with a third party that is not commercially reasonable. See Boulder Fruit, 261 F.3d at 1271-72.[7] Nothing in PACA alters these basic trust principles. A PACA trustee, like any other trustee, has authority to sell trust assets or borrow money secured by an interest in trust property. See Preamble to Regulations Under the Perishable Agricultural Commodities Act, 49 Fed. Reg. 45,-735, 45,738 (Nov. 20, 1984) (codified at 7 C.F.R. pt. 46) (stating that “the regulations do not prohibit a buyer or receiver from granting a secured interest in trust assets”); see also Nickey Gregory, 597 F.3d at 600 (holding that PACA permits the PACA trustee to transfer accounts receivable to a lender “as collateral for a secured loan”). And like any trustee, a PACA trustee is liable if it breaches its fiduciary duty. The Department’s regulations require the distributor-trustee to maintain trust assets “to satisfy outstanding obligations to sellers of perishable agricultural commodities” and prohibit “[a]ny act or omission which is inconsistent with this responsibility, including dissipation of trust assets.” 7 C.F.R. § 46.46(d)(1).[8] B The facts in this case must be understood in light of these principles. Tanimura Distributing, Inc. (TDI) was in the business of distributing produce. TDI bought produce on credit from numerous growers, including the plaintiffs in this action (collectively, “Palmer”). TDI then resold this produce to retail outlets, usually on credit. Under a Factoring Agreement, TDI gave Agricap Financial Corp. an interest in the retailers’ IOUs (i.e., TDI’s accounts receivable) in exchange for the cash TDI needed to pay its growers. These relationships are easier to understand by using a hypothetical example. Let’s say Palmer sells four bushels of tomatoes to TDI for $100 on credit. Per PACA, TDI holds the bushels in trust. See 7 U.S.C, § 499e(c)(2). TDI (as trustee) then sells the four bushels to Safeway for $200, and takes back an IOU, which is an asset of .the trust. Under the Factoring Agreement, TDI assigns the $200 Safeway IOU to AgriCap as the “absolute owner.” In exchange, AgriCap promptly pays TDI 80 percent of the face value of the $200 account receivable, $160. This $160 becomes an asset of the trust, held by TDI for the benefit of Palmer and other growers who sell to TDI on credit. After Agri-Cap collects the $200 from Safeway, it pays TDI the remaining 20 percent of the face value of the account receivable, less a 3 percent finance fee.[9] This payment becomes part of the trust corpus. Assuming Safeway paid on time, AgriCap would pay $34 to TDI, for a total payment of $194 for the benefit of the trust. The Factoring Agreement provided AgriCap some protections in exchange for taking the risk that the receivables would not be collectible. Among other things, AgriCap could require TDI to repurchase accounts receivable in certain circumstances, primarily if TDI had made an error in calculating the amount of produce sold to Safeway, and the Agreement required TDI to take back accounts receivable that were uncollectible after 90 days. However, AgriCap assumed the risk of loss in the event that Safeway became insolvent. In sum, TDI received an 80 percent advance on the value of its accounts receivable and would receive up to 97 percent of their face value. Because PACA creates a nonsegregated floating trust, TDI was statutorily authorized to use the money it received from AgriCap to pay all the growers, including Palmer, and with the 80 percent advance on each account receivable, was able to do so with increased speed. Although the Factoring Agreement states that TDI sold the accounts receivable to AgriCap, it is possible, as the majority suggests, to characterize the transaction as a loan. Maj. Op. at 801-02. If the arrangement is viewed as a loan, TDI, acting as a trustee, has borrowed $160 from AgriCap for the benefit of all the growers (the beneficiaries), and assigned the $200 Safeway account receivable to AgriCap as security for the loan. A lender taking only a security interest in an account receivable would typically not have any ability to collect the account receivable (unless the borrower defaulted). But the Factoring Agreement provides that once the $200 account receivable is assigned to AgriCap, it is the sole entity authorized to collect it. Therefore, to maintain the re-characterization of this transaction as a loan, we must view TDI as authorizing AgriCap to act as its collection agency, in addition to AgriCap’s role as secured lender. See Nickey Gregory, 597 F.3d at 603 (explaining, in the context of a similar agreement, that if the third party was “not a purchaser of the accounts receivable,” then it was “a lender and collection agent”). As TDI’s agent, AgriCap collects the $200 that Safeway owed TDI. Those funds are used to pay back the $160 loan to AgriCap, plus a $6 finance fee, leaving an additional $84 for the benefit of the growers (thus obtaining a grand total of $194 cash from the sale of the four bushels of tomatoes to Safeway). This relationship — however characterized — broke down in August 2008, when TDI failed to pay Palmer amounts owed for its produce. After Palmer sued TDI, the distributor filed for Chapter 7 bankruptcy protection. In re Tanimura Distrib., Inc., No. 2:08-bk-22644-TD (Bankr. C.D. Cal. Aug. 13, 2008), ECF No. 1. When it declared bankruptcy, TDI owed Palmer roughly $845,000.[10] Absent PACA, Palmer would have been an unsecured creditor. Instead, the assets of the PACA trust were available for distribution to Palmer, and TDI’s secured creditors could not touch them. The administrator of TDI’s bankruptcy estate thus went about “identifying, recovering, and liquidating the PACA trust assets of [TDI] and preserving those funds for the benefit of all PACA trust creditors.” Stipulation for Order Establishing PACA Trust Claims Procedure and Surcharge for Administrative Expenses at 11, In re Tanimura Distrib., Inc., No. 2:08-bk-22644-TD, (Bankr. C.D. Cal. Jan. 26, 2009), ECF No. 60 (approved by bankruptcy court, ECF No. 67).[11] After TDI’s bankruptcy filing, Palmer added AgriCap to its complaint in this case, alleging that TDI’s accounts receivable were PACA trust assets and AgriCap should return them to Palmer. In its motion for summary judgment, Palmer argued that TDI breached its fiduciary duty by granting AgriCap a security interest in accounts receivable from the sale of Palmer’s produce and by transferring those accounts receivable to AgriCap. Further, Palmer claimed, AgriCap knew TDI was in breach of trust and is therefore liable to Palmer for the value of the accounts receivable that TDI transferred to AgriCap. In effect, Palmer’s summary judgment motion claims that because TDI did not pay Palmer the $160 it initially borrowed from AgriCap, AgriCap has to make, good on TDI’s obligation. II Under trust law, AgriCap’s potential liability primarily turns on whether the TDI breached its fiduciary duty. As explained above, if TDI breached its fiduciary duty to Palmer and the growers by entering into the Factoring Agreement or by performing its obligations under the Factoring Agreement, and AgriCap was on notice of the breach, AgriCap would hold any security interest in the trust assets or any proceeds derived from those assets, in a constructive trust for the benefit of the growers. Because a PACA trustee can give a lender a security interest in trust assets, TDI did not breach its fiduciary duty to the growers merely by entering into the Factoring Agreement. The parties do not argue that the Factoring Agreement is commercially unreasonable; indeed, there would be no basis for doing so. In our example, TDI as trustee would get $194, or 97 percent of the $200 account receivable. This far exceeds the 80 percent return that we have approved in the sale of assets. See Boulder Fruit, 251 F.3d at 1272 (“[A] factoring discount of 20% was never shown to be commercially unreasonable”). And, in the loan scenario, AgriCap is merely acting as a collection agent, and it would not be commercially unreasonable for a creditor to agree that its collection agent can return accounts receivable that are uncollectible. Moreover, if TDI takes back the $200 uncollectible account receivable, TDI is no worse off than it was before it authorized AgriCap to collect the account receivable; TDI retains the asset, which has the same value before and after its transaction with AgriCap. After entering into the Factoring Agreement, TDI as trustee was bound by its terms (assuming AgriCap did not breach the agreement). If entering into the Factoring Agreement did not breach TDI’s fiduciary duties, then neither did complying with its terms. See Restatement (Third) of Trusts § 88 cmt. b (explaining that “if a trustee borrows funds from a third party for use in the administration of the trust,’ the interest on the loan is payable (or reimbursable) from the trust estate,” so long as the terms are “reasonable and the borrowing serves an appropriate trust purpose and is otherwise consistent with the trustee’s fiduciary duties”); Austin W. Scott et. al., Scott and Ascher on Trusts § 26.2 (5th ed. 2007) (noting that the trust estate remains liable for performing a contract entered into by the trustee, even when the contract “is not in all respects proper”). Indeed, no party argues that the Factoring Agreement is commercially unreasonable because it does not include a term that would allow TDI to delay making required loan payments until after all growers who provide produce to TDI have been fully paid.[12] In short, TDI did not breach its fiduciary duties as trustee when it entered into an agreement under which it received an 80 percent advance on each account receivable in exchange for repaying the advance plus a fee of 3 percent. Nor did TDI breach its fiduciary duties by complying with the terms of this agreement, which required TDI to repay the money borrowed from AgriCap. Therefore, AgriCap holds its interest in the accounts receivable and loan payments free of the trust. See Restatement (Second) of Trusts § 283. Under principles applicable to all trusts, including PACA trusts, AgriCap has no liability to Palmer or any other grower. Ill The majority agrees that basic trust principles apply to PACA trusts. Maj. Op. at 803. It also agrees that trust assets are excluded from the distributor’s bankruptcy estate if the distributor goes bankrupt. Maj. Op. at 803. It agrees that if a trustee “transfers trust property to a third person ... [without] committing] a breach of trust, the third person holds the interest so transferred or created free of the trust, and is under no liability to the beneficiary.” Maj. Op. at 803 (quoting Restatement (Second) of Trusts § 283). Finally, the majority agrees that a trustee can give a lender a security interest in PACA trust assets without violating PACA. Maj. Op. at 811-12. So how does the majority nonetheless reach the striking conclusion that if the Factoring Agreement is deemed to be a loan transaction, then AgriCap, which paid TDI $194 for a $200 trust asset, is liable to Palmer for the same $200?[13] See Maj. Op. at 809-10. The majority reasons that under a loan scenario, even if TDI did not breach its fiduciary duties by entering into a loan agreement, it breached them by complying with the terms of the loan agreement and repaying AgriCap’s loan. According to the majority’s analysis, because TDI repaid AgriCap’s loan before Palmer was paid (regardless whether TDI used AgriCap’s loan to pay other growers), AgriCap must make Palmer whole.[14] Maj. Op. at 812. As explained below, this conclusion is not based in PACA or trust law, is contrary to our precedent, and cannot reasonably be applied to these transactions. In reaching its conclusion that a trustee would breach its fiduciary duty by repaying the loan from trust assets “while the trust beneficiaries have not been fully compensated,” Maj. Op. at 811, the majority relies on Nickey Gregory Co. v. AgriCap, LLC, which analyzed a similar agreement between AgriCap and a PACA trustee. See 597 F.3d at 596, 601-02. The Fourth Circuit reasoned that the trustee’s arrangement with AgriCap “authorized trust assets to be used to repay AgriCap ahead of the commodities sellers, who went unpaid,” and such an arrangement “breached the PACA trust,” because the trustee “was obligated to ensure that trust assets remained freely available to pay PACA creditors first.” Id. at 604. Accordingly, the Fourth Circuit concluded that “AgriCap, as a third-party transferee of the trust assets, must, under established trust principles, disgorge the proceeds of the receivables unless it has a defense.” Id. The majority adopts this reasoning. While conceding that this result has no basis in trust principles, Maj. Op, at 811, the majority contends that this result is required by PACA, and quotes the regulation stating that PACA trustees “are required to maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities,” and this precludes a trustee from repaying a loan to the trust. Maj. Op. at 811-12 (quoting 7 C.F.R. § 46.46(d)(1)). The majority’s analysis, like that in Nickey Gregory, is critically flawed. First, the majority misunderstands the nature of trust assets. In the case of a loan, the trustee maintains two assets available for the growers: the $194 that the trustee received from the lender ($160 as an advance, $34 post-collection), and the accounts receivable subject to the lender’s $160 lien. The trustee’s repayment of the $160 to the lender does not dissipate the trust’s assets, because the trust is not entitled to that $160 under the terms of the loan agreement. The typical produce sales arrangement seems more questionable under the majority’s reasoning, because TDI relinquished the produce (an asset of the estate that is no longer freely available to the growers) to Safeway, and received only a promise to pay in return. Of course, Congress did not intend to preclude this sort of arrangement. Second, the majority misunderstands the nature of a trustee’s obligation in a loan agreement. Just like any trustee who takes out a loan for the benefit of the beneficiaries and uses trust assets as collateral, the PACA trustee must repay the loan according to the terms of the loan agreement, and the secured lender’s lien on those trust assets remains enforceable if the loan is not repaid.[15] Failure to pay the loan according to its terms would constitute a breach of the trustee’s fiduciary duties. See Scott et al., supra, § 17.8 (“A trustee of property subject to a mortgage must take reasonable steps to prevent loss of the property by foreclosure.”). The majority cites nothing in PACA that allows the trustee to disregard such an obligation, and we “do not construe statutes in a manner that would lead to absurd results,” nor “impute to Congress an intent to create a law that produces an unreasonable result.” United States v. Casasola, 670 F.3d 1023, 1029 (9th Cir. 2012). Indeed, the majority’s theory of breach — that the trustee cannot repay a loan to the trust until all beneficiaries have been paid — would likely preclude a trustee from borrowing money secured by trust assets. Because PACA is a nonsegregated floating trust, 7 C.F.R. § 46.46(b), each grower has a claim on the trust assets, whether they were acquired before or after the grower sold its produce to the trustee. See In re Kornblum & Co., Inc., 81 F.3d 280, 286 (2d Cir. 1996) (holding that “a single PACA trust exists for the benefit of all of the sellers to a Produce Debtor, and continues in existence until all of the outstanding beneficiaries have been paid in full.”). So long as the trustee continues to purchase produce from growers on credit, there will be new growers who have not yet been paid and therefore the trustee would be precluded from repaying any lender from the trust assets. No lender would enter into a loan agreement if the law precluded repayment of the loan. Perhaps realizing that there is no statutory basis for holding that a PACA trustee cannot repay a lender pursuant to the terms of the loan agreement, the majority posits that if a PACA trustee borrows from a lender, and secures the loan with an interest in trust property, the beneficiaries have a priority lien on the trust property over all other lenders. Maj. Op. at 809-10. The majority analogizes to circumstances where state law protects a creditor by giving that creditor a priority lien over all other creditors. Maj. Op. at 809-11. This framework, however, is divorced from the language of PACA and basic principles of trust law. Congress could well have provided that when a distributor purchases a grower’s produce on credit, the grower would be deemed, by operation of law, to have a lien on that produce (and its proceeds) that has priority over the liens of all other creditors. But, there is nothing to this effect in PACA. Rather, Congress elected to rely on a trust mechanism, and to protect growers by making the distributor a trustee holding their proceeds in trust. See 7 U.S.C. § 499e(c)(2). A beneficiary of a trust does not have any lien on trust assets, let alone a priority lien.[16] Although the majority purports to follow the lead of three other circuits, only the Fourth Circuit has adopted the theory that a trustee’s loan repayments in the ordinary course of business are a breach of trust. In Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co., 336 F.3d 410, 413-14 (5th Cir. 2003), and Endico Potatoes, Inc. v. CIT Group/Factoring, Inc., 67 F.3d 1063, 1067-68 (2d Cir. 1995), the courts analyzed whether a transaction between a PACA trustee and a third party constituted a loan or “true sale” in order to determine whether the transferee was a bona fide purchaser under section 284 of the Restatement (Second) of Trusts.[17] Since section 284 applies only if the trustee breaches its fiduciary duty, see supra p. 816; Boulder Fruit, 251 F.3d at 1272 (“Whether a transferee of trust assets is a bona fide purchaser becomes relevant only as a defense after it has been determined that a breach of trust has occurred.”), those courts necessarily presumed that a breach had occurred, but did not explain their theory.[18] None suggested that the trustee’s repayment of a loan according to its terms constituted a breach of the trustee’s fiduciary duty. Moreover, the Second Circuit has recognized, consistent with Boulder Fruit, “that it is not a breach of trust for a PACA dealer to use PACA funds to enter into ‘commercially reasonable’ transactions with parties not protected by PACA, particularly where such transactions facilitate a PACA dealer’s fulfillment of his obligations to PACA beneficiaries.” E. Armata, Inc. v. Korea Commercial Bank of N.Y., 367 F.3d 123, 133 (2d Cir. 2004); see also D.M. Rothman & Co. v. Korea Commercial Bank of N.Y., 411 F.3d 90, 96 (2d Cir. 2005) (holding that a third-party bank was not liable for its receipt of a PACA trustee’s account fees, interest, and any other funds whose “retention was commercially reasonable”). Nor does the majority explain how its analytic framework applies to the facts in this case. If the Factoring Agreement is in fact a loan agreement, then AgriCap loaned TDI between $19,057,000 and $20,425,000 for many different accounts receivable, and TDI ultimately paid back (through AgriCap’s collections on the accounts receivable) some amount up to the loan amount plus a finance fee for each of those accounts receivable.[19] Although the majority indicates that AgriCap is liable to Palmer for some portion of the money AgriCap received in repayment of its $19-20 million in loans, the majority gives no direction to the district court on how to determine the extent to which AgriCap is liable. To the extent the majority’s reasoning would require AgriCap to repay principal and interest on its loan, the majority effectively makes the factor the trustee’s guarantor, who must make the beneficiaries whole if the trustee does not do so. But it is already settled that “third parties are not guarantors of the PACA trust.” Boulder Fruit, 251 F.3d at 1272; Consumers Produce Co. v. Volante Wholesale Produce, Inc., 16 F.3d 1374, 1381 (3d Cir. 1994) (“The produce purchaser is the trustee of the trust and creditors are not insurers of unpaid beneficiaries when they receive trust assets in breach of trust.”); C.H. Robinson Co. v. Tr. Co. Bank, N.A., 952 F.2d 1311, 1316 (11th Cir. 1992) (“Secured lenders are not guarantors of PACA trusts.”). At bottom, the majority’s concern appears to be that trust principles are insufficiently protective of growers here. But the majority offers no principled distinction for why a trustee can sell produce for cash, sell an account receivable for cash, but not borrow cash secured by the produce or account receivable, even though the trustee gets substantially the same amount of cash for the benefit of the growers in each transaction. More fundamentally, the majority’s discussion of PACA’s purpose seems to conflate lenders-to-the-distributor with lenders-to-the-trustee. Lenders to the distributor cannot reach PACA assets in bankruptcy because TDI holds those assets in trust for the growers. See Sunkist Growers, 104 F.3d at 282. But when we deal with secured lenders to the trust, the loan advance and subsequent payments become trust property, and it is fully consistent with PACA’s purpose to look at whether the trust got a fair (i.e., commercially reasonable) deal. Once we discard the majority’s theory of breach, its discussion of the test for a “true sale” becomes irrelevant. Maj. Op. at 808-09. In the trust context, the key question is not whether the trustee is engaged in a sale or loan, but whether the trustee breached its fiduciary duty in entering into the loan agreement (and complying with it according to its terms). The answer to that question turns primarily on the commercial reasonableness of the individual transaction and its terms. IV By enacting PACA, Congress provided significant protection to growers by ensuring that a distributor who buys their produce on credit owes the growers a fiduciary duty to manage the trust assets (the produce and its proceeds) for their benefit. Contrary to the majority’s assertion, this protection does not entitle growers to disregard obligations undertaken by the trustee on their behalf. If the trustee borrows money for the benefit of the beneficiaries in a commercially reasonable transaction, the lender is entitled to be paid back from trust assets. Under trust principles and PACA, there is an exception to this rule only if the trustee breached its fiduciary duties when it entered into the loan arrangement, and the lender was on notice of this breach. In this context, there is no need to distinguish between “true sales” and “loans.” In other words, we had it right in Boulder Fruit: we look at the commercial reasonableness of the agreement to determine whether it was a breach of trust, regardless whether the agreement is a sale or a loan. Recourse provisions and other features that “transfer risk” may be relevant to this analysis. But unless the transaction is commercially unreasonable or otherwise a breach of the trustee’s fiduciary duty, there is no basis under PACA or trust law for depriving the lender of its right to repayment under the loan agreement or, as in this case, requiring a lender that has loaned money to the trust and been repaid by the borrower to return the borrower’s repayment. The majority’s approach is inconsistent with PACA, and that should be enough to reject it. “[W]e will not presume with [appellants] that any result consistent with their account of the statute’s overarching goal must be the law but will presume more modestly instead ‘that [the] legislature says ... what it means and means ... what it says.’ ” Henson v. Santander Consumer USA Inc., — U.S. -, 137 S.Ct. 1718, 1725, 198 L.Ed.2d 177 (2017) (third, fourth, and fifth alterations in original) (quoting Dodd v. United States, 545 U.S. 353, 357, 125 S.Ct. 2478, 162 L.Ed.2d 343 (2005)). But the majority's approach also makes no sense as a practical matter. Under the majority’s decision, a transaction in which the trustee made a commercially reasonable sale of a $200 account receivable to AgriCap and received $150 in return would not constitute a dissipation of trust assets, and AgriCap could keep the $200 it collected on the account receivable from the retailer. But a transaction in which the trustee received a $200 loan from AgriCap (secured by a security interest in the same $200 account receivable) and agreed to pay back the loan when it collected the $200 from the retailer, would constitute a dissipation of assets if the trustee paid back the loan.[20] By imposing these drastically divergent outcomes based on the loan-sale distinction, the majority fails to heed its own advice that “courts must focus on the true substance of PACA-related transactions and not on artificial indicators or labels.” Maj. Op. at 808. Moreover, the majority’s approach will hurt PACA beneficiaries in the long run. If lenders face the prospect that any repayments they receive will be a breach of trust and subject to disgorgement, they will either refuse to engage in factoring transactions or impose more severe terms to account for the heightened risk.[21] I respectfully dissent. . The 1984 Amendments also created a procedure for enforcing trust rights. Section 499e(c)(3) provided that a beneficiary must preserve its right to benefits by issuing written notice to the trustee within 30 days after the trustee’s failure to make payment. 7 U.S.C. § 499e(c)(3). Section 499e(c)(4) allowed a beneficiary to alternatively preserve its rights through standardized language on billing or invoice statements. Section 499e(c)(5) vested jurisdiction in federal district courts to hear "(i) actions by trust beneficiaries to enforce payment from the trust, and (ii) actions by the Secretary to prevent and restrain dissipation of the trust.” The plaintiffs in this case included the standardized language on their invoices to Tanimura Distributing, Inc. (TDI). . The current trend is to rely on both the Second and Third Restatements of Trusts. See, e.g., United States v. Jicarilla Apache Nation, 564 U.S. 162, 177-78, 183-84, 131 S.Ct. 2313, 180 L.Ed.2d 187 (2011) (relying on both the Second and Third Restatement); Skinner v. Northrop Grumman Ret. Plan B, 673 F.3d 1162, 1166-67 (9th Cir. 2012) (same); Lonely Maiden Prods., LLC v. Golden-Tree Asset Mgmt., LP, 201 Cal. App. 4th 368, 379, 135 Cal.Rptr.3d 69 (2011) ("California trust law is essentially derived from the Restatement Second of Trusts. Over a number of years, the Restatement Second of Trusts has been superseded by the Restatement Third of Trusts. As a result, we may look to the Restatement Third of Trusts for guidance.”). . Because the PACA trust is a “nonsegregated ‘floating’ trust,” it permits "[cjommingling of trust assets.” 7 C.F.R. § 46.46(b); H.R. Rep. No. 98-543, at 4. Commingling relieves trustees of the burden "to specifically identify all of the trust assets through each step” of administering the trust. H.R. Rep. No. 98-543, at 5. . Restatement (Second) of Trusts § 283 states: If the trustee transfers trust property to a third person or creates a legal or equitable interest in the subject matter of the trust in a third person, and the trustee in making the transfer or in creating the interest does not commit a breach of trust, the third .person holds the interest so transferred or created free of the trust, and is under no liability to the beneficiary. .Although the Second Restatement uses the term "bona fide purchaser,” the term also applies when the trustee "creates a legal interest” in trust property, § 284(1), such as by giving “a legal mortgage or pledge or legal lien upon the trust property,” id. § 284 cmt. g. In other words, a lender’s security interest may be protected by the bona fide purchaser defense, even if the trustee breached its fiduciary duty by granting the interest. .Equity recognizes some exceptions to this rule. A third party that has conferred a benefit on the trust estate may be entitled to reimbursement from trust assets. See, e.g., Restatement (Second) of Trusts § 291 cmt. o ("If the trustee in breach of trust transfers trust property to a person who takes with notice of the breach of trust and who pays value for the trust property, and the beneficiary compels him to restore the property to the trust or to account for its value or for the proceeds, the transferee is entitled to credit for the amount which he paid for the trust property to the extent to which the trust estate has the benefit thereof.”); id. § 269 ("A person who has conferred a benefit on the trust estate and cannot obtain satisfaction of his claim out of the trustee’s individual property can by a proceeding in equity reach trust property and apply it to the satisfaction of his claim to the extent to which the trust estate has been benefited, unless under the circumstances it is inequitable to allow him such remedy.”); see also Thomas v. Provident Life & Tr. Co., 138 F. 348, 349 (9th Cir. 1905) (holding that even if the trustee granted a lender a mortgage on trust property in breach of the trust, the trust estate "having received the benefit of the money, ought, in equity, to repay' it, with interest.”). . The breaching trustee is also liable to the beneficiaries. "[I]f the trustee wrongfully uses trust money in his own business, or if he lends trust money to himself, the beneficiary can impose a constructive trust or equitable lien upon the proceeds if he can trace them.” Restatement (Second) of Trusts § 202 cmt. e. . Dissipation is defined as "any act or failure to act which could result in the diversion of. trust assets or which could prejudice or impair the ability of unpaid suppliers, sellers, or agents to recover money owed in connection with produce transactions.” 7 C.F.R. § 46.46(a)(2). . Under the terms of the Agreement, Agri-Cap's fees were only 1,5 percent, meaning that TDI would get 98,5 percent of the face value of each account receivable. In practice, AgriCap asserts that it paid TDI on average 97 percent of the receivable's value, and Palmer does not contend otherwise. Earlier in this litigation, AgriCap stated that it paid 98.2 percent on average. The district court did not make a finding on the actual amount paid, but estimated that it was "likely in the 90% range,” . In its initial complaint, Palmer sought to recover approximately $882,000 in unpaid debts from produce sales, but now seeks only .$845,000. . TDI’s bankruptcy estate has now been fully distributed. See Chapter 7 Trustee’s Final Account, In re Tanimura Distrib., Inc., No. 2:08-bk-22644-TD, (Bankr. C.D. Cal. Aug. 7, 2014), ECF No. 262. . As indicated below, infra at p. 822-23, because PACA is a nonsegregated floating trust, such a term would likely prevent TDI from every repaying a lender. . If described as a loan, this means that after TDI borrowed $194 and subsequently repaid the $194 loan (plus fees) to AgriCap, AgriCap must return the $194 plus fees to TDI, with no prospect of ever getting its loan repaid. . More precisely, the majority states that a trustee breaches its fiduciary duties “whenever the lender recovers its fee or percentage from the accounts receivable while the trust beneficiaries have not been fully compensated.” Maj. Op. at 811. It is not clear whether the majority deems the breach to be limited to a trustee’s payment of interest to a lender, or deems the trustee’s repayment of principal to the lender to also be a breach of trust. Nor does the majority make clear whether a lender must return only the interest it received on the loan or must also return the repayment of principal. Nevertheless, the majority’s adoption of this analysis indicates that the majority assumes the lender must return both interest and principal to the trustee. See Nickey Gregory, 597 F.3d at 606-07 (rejecting Agri-Cap's alternative argument that it should be required to disgorge only “the amount it received in interest and fees” and instead requiring it to disgorge all collections on receivables up to the amount of growers’ claims). . At oral argument, AgriCap's counsel stated that the trust estate no longer contains any uncollected accounts receivable subject to a " security interest, and so such accounts receivable are not at issue in this appeal. U.S. Court of Appeals for the Ninth Circuit Court, Oral Argument 14-56059 G.W. Palmer & Co. v. Agri-Cap Fin. Corp., Youtube 28:30-28:50 (Sept. 20, 2017), https://www.youtube.com/watch? v=iikaXV7nkaw. But were the issue before us, basic principles of trust law establish that AgriCap would have the same rights with respect to those accounts receivables as it would to the proceeds. If TDI, as trustee, did not breach its fiduciary duties when it borrowed money from AgriCap (or AgriCap did not have knowledge of the breach), and the trustee still owed AgriCap money on the loan, then Agri-Cap would be entitled to foreclose its security interest on the accounts receivable according to the terms of the loan agreement. See Restatement (Second) of Trusts §§ 283-84, 288 (explaining that a third-party lender holds its security interest in trust property free of the trust unless the grant of the interest was a breach of the trustee's fiduciary duty, the lender had notice, and the lender did not give value). While AgriCap’s counsel stated in response to questioning that a lender’s interest in the accounts receivable would be subordinate to the growers' interests as beneficiaries, Maj. Op. at 812 n.ll, we do not construe statutes based on passing statements at oral argument. Roberts v. Galen of Va., Inc., 525 U.S. 249, 253, 119 S.Ct. 685, 142 L.Ed.2d 648 (1999) (per curiam) ("[T]he concession of a point on appeal by [a party] is by no means dispositive of a legal issue.”). Here, the growers' interests would be superior only to creditors of TDI as a debtor, not to creditors of TDI as trustee. .Although the Department of Agriculture stated in the preamble to its regulations that a lender that takes a secured interest in a PACA trust asset takes "a secured interest [that] is secondary and specifically voidable in order to satisfy debts to unpaid suppliers, sellers, or agents in perishable agricultural commodity transactions,” Preamble to Regulations Under the Perishable Agricultural Commodities Act, 49 Fed. Reg. at 45,738, this language is contrary to the language of the statute and the regulations themselves, and so merits no weight, see Mines v. Sullivan, 981 F.2d 1068, 1070 (9th Cir. 1992) (‘‘A court need not accept an agency’s interpretation of its own regulations if that interpretation is inconsistent with the wording of the regulation or inconsistent with the statute under which the regulations were promulgated.”). . As explained above, the bona fide purchaser defense applies equally to a lender’s security interest in trust assets or the purchase of trust assets. See supra p. 816 n.5; Restatement (Second) of Trusts § 284 & cmt. g. . The majority also cites A & J Produce Corp. v. Bronx Overall Economic Development Corp., which relied on Reaves and Endico Potatoes for the proposition that a lender is not a bona fide purchaser for value, but likewise failed to identify any breach by the trustee. 542 F.3d 54, 58-59 (2d Cir. 2008). . The parties dispute the amounts AgriCap loaned to TDI and the amounts that TDI repaid AgriCap. , As explained above, supra p. 822-23, the distributor-trustees constantly generate new outstanding obligations to growers in the ordinary course of business, meaning that in practical terms, any repayment could be a breach under the majority’s theory. . "[I]n desperation,” the majority attempts to distract attention from the necessary implications of its own logic by pointing to policy issues, passing statements in oral argument, and its reliance on the Fourth Circuit’s similar errors. Maj. Op. at 812 n.11, Instead of reasoning and analysis, the majority offers only conclusory statements. For instance, the majority states "nowhere do we suggest that trusts are free to disregard their obligations to lenders.” But this is contrary to the majority’s own reasoning, that "whenever a loan is made, a PACA trustee must be careful to ensure all trust beneficiaries are paid before the lender collects.” Maj. Op. at 811. Said otherwise, a trustee cannot repay the lender according to the terms of the loan. Or at all— as explained above, supra p. 822-23, given the nature of a floating, nonsegregated trust, some trust beneficiaries will be unpaid at any given time. Similarly, the majority argues we should not consider the consequences of its theory of breach, because it remands to the district court for a determination of damages. Maj. Op. at 812 n.11. But it requires no "interested speculation and conjecture” to conclude that, .if the Factoring Agreement is deemed to be a loan, AgriCap would have to return all loan payments it received, up to the value of TDI’s debts to Palmer. See Nickey Gregory, 597 F.3d at 607 n.2 ("As we have noted, because the accounts receivable and their proceeds were trust assets, the unpaid commodities sellers have a prior interest in them and can recover from AgriCap to the full satisfaction of their debts up to the limit of trust assets held while they remained unpaid.”).